UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BENJAMIN RETTIG, #307829,                             Case No. 2:22-cv-208

                              Plaintiff,              Hon. Hala Y. Jarbou
                                                     Chief U.S. District Judge
         v.

UNKNOWN TENNYSON, et al.,

                              Defendants.
_____/

**REPORT AND RECOMMENDATION**

## I.    Introduction

This Report and Recommendation (R. & R.) addresses Defendants' motion for

summary judgment.  (ECF No. 31.)

Plaintiff — state prisoner Benjamin Rettig — filed suit pursuant to 28 U.S.C.

§ 1983 on October 24, 2022.  In his unverified complaint, Rettig alleged that while he

was incarcerated at the Alger Correctional Facility (LMF) in Munising, Michigan,

LMF staff[1] utilized excessive force against him in violation of his Eighth Amendment

rights.  (ECF No. 1, PageID.6.)  More specifically, Rettig alleged that on January 26,

2021, LMF staff handcuffed him and took him out of his cell, escorted him away from

_____

[1]       Rettig named the following LMF officials as Defendants in his complaint:  (1)
Corrections Officer (CO) Tennyson, (2) CO Neun, (3) CO Britton, (4) CO Hill, (5) CO
Lester, (6) CO Trombley, (7) CO Moote (spelled "Moot" in the complaint), (8) Sergeant
(Sgt.) Mann, (9) Sgt. Kortman, (10) Lieutenant (Lt.) Price, (11) Grievance Coordinator
Lancour, (12) Hearing Investigator Jack, (13) Physician Assistant (PA) Westcomb,
and (14) Warden Sarah Schroeder.

his cell, escorted him back to his cell, and then slammed him to the ground.  In slamming Rettig to the ground, LMF staff allegedly knocked Rettig unconscious, broke his jaw, and severely injured his right knee.  (*Id.*)  Rettig further alleged that on January 30, 2021, additional LMF staff put him in a chokehold and beat him with handcuffs around their knuckles.  Following this beating, Rettig says that he was diagnosed with splenic and renal cysts, a partially collapsed lung, and spinal bone spurs.  (*Id.*)

On November 14, 2022, this Court issued a screening opinion finding that Rettig's complaint stated: "personal capacity Eighth Amendment excessive force claims for damages against Defendants Tennyson, Neun, Hill, Lester, Trombley, and Moot[e];  . . .  personal capacity failure to intervene claims for damages against Defendant Britton; and . . . state law 'gross negligence' claims against Defendants Tennyson, Neun, Hill, Lester, Trombley, Moot[e], and Britton."  (ECF No. 5, PageID.32.)  On January 10, 2023, Attorney Daniel Randazzo appeared on Rettig's behalf for the purposes of early mediation, and on January 18, 2023, Randazzo appeared on Rettig's behalf for the remaining proceedings.

Defendants now move for summary judgment.  (ECF No. 30.)  Defendants aver that video-recordings of the January 26, 2021, and January 30, 2021, incidents establish that they were required to use force against Rettig in order to restore discipline, and that they did not use force maliciously or sadistically to cause Rettig harm.  (ECF No. 31, PageID.116-130.)  In response, Rettig contends that there are genuine issues of material fact with respect to whether the force used during the

January 26, 2021, and January 30, 2021, incidents — which  broke his jaw, and injured his spleen and liver — was proportionate. (ECF No. 33, PageID.300-301.)

In the undersigned's opinion, there are no genuine issues of material fact with respect to Rettig's federal claims.  Even viewing the facts in the light most favorable to Rettig, a reasonable juror could not determine that Defendants utilized excessive force or failed to intervene in the use of excessive force against Rettig on January 26, 2021, or January 30, 2021.  Videos of the incidents establish that Rettig continually refused to adhere to staff orders.  Furthermore, the videos establish that Rettig physically resisted staff.  It is clear from the videos that staff utilized force against Rettig on both dates in order to regain control over Rettig, and not maliciously or sadistically to cause harm.  Accordingly, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment as to Rettig's federal claims.  The undersigned further recommends that the Court decline to exercise supplemental jurisdiction over Rettig's state law claims.

## II.    Factual Background

The parties have provided numerous accounts of the alleged incidents of excessive force and the resulting injuries for the Court's consideration.  Those sources include, but are not limited to, Rettig's complaint allegations,[2] critical incident reports, video recordings of the incidents from various angles, and medical records.

---

[2]    The undersigned acknowledges that Rettig's complaint allegations are unverified, and therefore do not hold the weight of sworn statements.  However, Rettig repeated the majority of his complaint allegations during his deposition. (ECF No. 33-2 (Rettig Dep.).)

### a. Rettig's Factual Allegations

Rettig alleges that at 7:30 a.m. on January 26, 2021, Defendant Corrections Officers (COs) Tennyson and Neun took Rettig out of his cell at the Alger Correctional Facility (LMF) in handcuffs. (ECF No. 1, PageID.6.) Rettig says that the officers told him they needed an updated photograph. When they returned from taking the photograph, Rettig alleges that Defendant CO Britton was waiting in Rettig's darkened cell. (*Id.*) According to Rettig, COs Tennyson and Neun then slammed him to the ground, thereby knocking him unconscious, dislocating and breaking his jaw, and severely injuring his right knee.

Rettig then alleges that while he was "sitting in his door requesting medical care" on January 30, 2021, Defendant COs Hill, Lester, Trombley, and Moote "severely assaulted" Rettig with handcuffs around their knuckles. (*Id.*) Rettig says that the COs "picked him up by his neck in a chokehold . . . and beat him so severely he had to go to the hospital for a CT scan of his abdomen."

Rettig says that at the time of the incidents, he had been diagnosed by his psychiatrist as "severely mentally ill." (*Id.*) As a result of the incidents, Rettig says that there were "extreme amounts" of blood in his urine for eight months. He says that the CT scan showed splenic and renal cysts as well as a partially collapsed lung and bone spurs on Rettig's spine. Rettig alleges that he has suffered severe post-traumatic stress as a result of the incidents, that he has lost forty pounds, and that he has been seeing a facial surgeon. (*Id.*)

### b. Critical Incident Reports

Defendants provided critical incident reports from both alleged incidents of excessive force.  Those reports are summarized as follows.

### i. January 26, 2021, Critical Incident Report

According to the January 26, 2021, Critical Incident Report, COs Tennyson and Neun placed Rettig in behind-the-back wrist restraints at approximately 8:29 a.m. so that CO Britton could conduct a cell search.  (ECF No. 31-7, PageID.211.) When COs Tennyson and Neun escorted Rettig back to his cell following the search, Rettig lunged towards CO Britton.  CO Neun attempted to pull Rettig back but was unable to regain control over Rettig.  (*Id.*) CO Tennyson therefore took Rettig to the ground.  At this point, additional staff arrived to assist the COs, placing Rettig in leg restraints.  (*Id.*)  Rettig was then escorted to a shower stall, where CO Britton attempted to conduct a strip search.  Rettig refused to comply.  After allowing Rettig time to cool down, another staff member conducted the strip search, and then escorted Rettig back to his cell.  (*Id.*)

Rettig was evaluated by a registered nurse while he was in the shower stall. (*Id.*, PageID.219.)  Rettig reported that the right side of his head hurt, and the nurse noted slight redness to the right temporal area.  The nurse offered to assess Rettig in the clinic, but Rettig refused.  (*Id.*)

The Critical Incident Report notes that Rettig was given two Class I misconduct tickets as a result of this incident: one for assault and battery against Neun, and one for disobeying a direct order from Britton.  (*Id.*, PageID.211.)

### ii. January 30, 2021, Critical Incident Report

According to the January 30, 2021, Critical Incident Report, Rettig took control of his door slot while staff were collecting dinner trays. (ECF No. 31-5, PageID.165.) Rettig wrapped a towel around the hinge of the slot so that it could not be closed and secured. Staff ordered Rettig to remove his arm from the slot so that it could be secured numerous times. (*Id.*) When Rettig refused, the Warden approved the use of chemical agent and a move team, if necessary. A nurse evaluated Rettig and deemed him a "medium risk" for chemical agent. (*Id.*)

According to the Critical Incident Report, the move team included: Sgt. Parkkila, CO Trombley, CO Lester, CO Hill, CO Moote, CO Haukkala, and CO Rondeau. It says that after the move team arrived at Rettig's cell on January 30, 2021, CO Hill gave Rettig repeated orders to remove the towel from his door slot and throw it out into the hall. (*Id.*) Rettig responded by telling the team to "f— off." Sgt. Parkkila then administered a three-second burst of chemical agent through the door slot, but Rettig continued to hold the slot open. (*Id.*) Rettig also threw a cup of unidentified liquid at the move team.

At this point, CO Hill ordered Rettig to stand up, remove his clothes, and allow the team to restrain him through the door slot. (*Id.*) When Rettig continued to refuse orders, Sgt. Parkkila administered another three-second burst of chemical agent through the door slot. Rettig stood up and began coughing while leaning on his cell door. (*Id.*) CO Hill and Sgt. Parkkila again ordered Hill to remove his clothing and

allow the team to restrain him, but Rettig continued to lean against his door shouting "F— off! I need my TV!"

Upon Rettig's continued refusal to comply with orders, Sgt. Parkkila ordered the move team to force entry into Rettig's cell. (*Id.*) That forced entry proved challenging because Rettig had tied himself to the other end of the towel affixed to his door slot. As the team forced entry, Rettig leaned against the shield held by CO Hill. (*Id.*) After the team cut Rettig's towel, CO Hill used the shield to push Rettig onto his bed and hold him down. COs Haukkala and Moote attempted to restrain Rettig, but Rettig continued to resist by way of pushing, pulling, and trying to break free. (*Id.*) Rettig also laid on one of his arms, making it impossible for the COs to restrain him.

The Critical Incident Report reflects that upon Rettig's continued resistance, CO Moote applied "the mandibular angle pressure point technique" to Rettig. Eventually, CO Haukkala was able to apply wrist and leg restraints. The move team members then removed Rettig's clothing and performed a strip search. Rettig was then moved to another cell, where he was evaluated by a registered nurse. (*Id.*)

Upon evaluation, the registered nurse noted that Rettig had a bloody nose. (*Id.*, PageID.173.) Rettig reported that his nose had hit his cell door. Rettig was then taken to the clinic for assessment, where he reported that his nose was tender to the touch, but that it does not take much to make his nose bleed. (*Id.*)

The Critical Incident Report notes that Rettig was given four Class I misconduct tickets for assault and battery against staff as a result of this incident. (*Id.*, PageID.165.)

### c. Video Recordings

The parties provided numerous video recordings of the time surrounding the alleged incidents of excessive force.

#### i. January 26, 2021

Defendants provided three[3] video recordings of the January 26, 2021, incident: one from the front of Aspen B-Wing (Defs.' Ex. A-1), one from the back of Aspen B-Wing (Defs. Ex. A-2), and one of staff returning Rettig to his cell (Defs.' Ex. A-3).

#### 1. Defendants' Exhibit A-1

The first recording provided by Defendants begins with COs Tennyson and Neun walking towards cell 218 in Aspen B-Wing. (Defs.' Ex. A-1 at 00:00-00:18.) CO Neun opens the slot in the cell door and appears to address Rettig. (*Id.* at 00:19-00:21.) A moment later, CO Tennyson leans on the cell door and addresses Rettig. (*Id.* at 00:25-00:31.) CO Neun then attaches a handcuff tether to Rettig from outside of the cell. (*Id.* at 00:35-00:59.) While this is happening, CO Britton approaches and stands with his back against the wall next to Rettig's cell. CO Neun then opens Rettig's cell door, and Rettig backs out of his cell with his hands cuffed and tethered

---

[3]     In listing their video exhibits, Defendants indicated that they were providing handheld camera footage from January 26, 2021 as Exhibit A-4. (ECF No. 31-2, PageID.136.) However, the drive provided by Defendants does not contain this handheld footage.

behind his back.  (*Id.* at 01:05-01:08.)   CO Neun grabs hold of the tether, and CO Britton enters Rettig's cell.  (*Id.* at 01:09-01:12.)  COs Neun and Tennyson then escort Rettig out of view.  (*Id.* at 01:12-01:18.)

Approximately twenty seconds after the COs escort Rettig out of view, CO Britton throws something out of Rettig's cell and into the hallway.  (*Id.* at 01:38.)  A few seconds later, Britton throws a second object out into the hallway.  (*Id.* at 01:40.)

COs Neun and Tennyson escort Rettig back into view shortly thereafter.  (*Id.* at 1:58.)  At this point, CO Britton is still in Rettig's cell.  CO Neun holds Rettig's tether with only one hand.  As the COs approach the cell with Rettig, Rettig looks into the doorway of the cell.  (*Id.* at 02:03-02:05.)  Rettig then tries to walk into the cell.  (*Id.* at 02:06-02:07.)  After Rettig begins to walk towards Britton, CO Neun grabs the tether with his other hand, and CO Tennyson grabs hold of the tether with one of his hands.  (*Id.* at 02:07-02:08.)  The COs pull the tether back to them, but Rettig forcibly pulls at the tether.  (*Id.* at 02:08-02:10.)  After Rettig continues struggling with the COs, CO Tennyson takes Rettig to the ground.  (*Id.* at 02:11-02:12.)  Rettig continues to struggle with CO Tennyson on top of him, kicking his legs.  (*Id.* at 02:13-02:20.)  By this point, CO Britton has exited Rettig's cell.

Once CO Tennyson restrains Rettig's head and CO Neun restrains Rettig's legs, CO Britton approaches along with a number of other staff members.  (*Id.* at 02:22-02:40.)  One of the additional staff members puts Rettig in leg restraints.  (*Id.* at 02:41-02:55.)  Rettig remains on the floor with COs Tennyson and Neun for approximately one minute, until CO Britton places a spit guard around his face.  (*Id.*

at 02:56-04:22.)  The COs then pull Rettig off of the ground, but Rettig appears to refuse to stand.  (*Id.* at 04:30-04:50.)  The COs carry Rettig into a shower stall at the end of the hall.  (*Id.* at 04:51-05:16.)  Rettig stays in the stall for the remainder of the recording.  (*Id.* at 05:16-07:00.)

### 2.  Defendants' Exhibit A-2

The second recording provided by Defendants was filmed on a camera positioned on the opposite side of Rettig's housing wing.  That camera is positioned closer to Rettig's cell.  The shower stall is beyond the view of the camera, so the second recording does not show Rettig being placed in the shower stall.  But with that exception, the second recording depicts the same events as the first recording.  (Defs.' Ex. A-2 at 00:00-05:50.)

### 3.  Defendants' Exhibit A-3

The third and final recording provided by Defendants is from the same camera angle as the first recording.  The third recording begins with two staff members standing near the shower stall where Rettig was taken.  (Defs.' Ex. A-3 at 00:00-00:28.)  After a moment, a third staff member walks up a staircase in front of the shower stall.  (*Id.* at 00:29-00:30.) The staff member appears to be holding a key.  The staff member unlocks the shower stall and removes Rettig from the stall.  (*Id.* at 00:31-00:48.)  Rettig is then escorted back to his cell without incident.  (*Id.* at 00:49-01:45.)

### ii.  January 30, 2021

Defendants provided five[4] video recordings from the January 30, 2021, incident: one from a handheld camera (Defs.' Ex. A-5), one from the front of Aspen B-Wing (Defs.' Ex. A-6), one from the back of Aspen B-Wing (Defs.' Ex. A-7), one from inside the observation cell where Rettig was taken after the cell extraction (Defs.' Ex. A-8), and one from the lobby of the Aspen housing unit (Defs.' Ex. A-9).  Rettig also provided a video recording from January 30, 2021, but his recording documents the time prior to the deployment of the move team.  (Plf.'s Ex. H.)

### 1.  Rettig's Exhibit H

The recording provided by Rettig was taken from a handheld camera.  The recording begins with Rettig asking the CO holding the camera whether he is recording.  (Plf.'s Ex. H at 00:00-00:02.)  When the CO informs Rettig that the batteries went dead for a second, but that the camera is now recording, Rettig responds: "Oh, yeah.  It just happened that the batteries went dead when the Lieutenant came up here and, you know, threatened me.  Man, that's so convenient.  Super convenient." (*Id.* at 00:03-00:15.)  Rettig then states: "I'm on psych medication and they're about to mace me.  And I'm having a peaceful protest." (*Id.* at 00:22-00:27.)

After a moment, Rettig continues talking.  He states:

> You know, they can uh.  They can go to excessive force and, you know, measures like that when they, when they want to take my TV.  So why

---

[4]     In listing their video exhibits, Defendants indicated that they were providing only four video recordings from the January 30, 2021, incident.  (ECF No. 31-2, PageID.136.)

> can't they do peaceful things and give me my TV?  Why can't I be
> peaceful and get my TV?  It makes no sense.  And Lester told me that I
> could have my slot open if I wanted.  He said if I want to sit here until
> Monday, that's what I wanted.  So, I don't know which one of these
> officers is lying, and which is telling the truth.

(*Id.* at 00:38-01:09.)  Ultimately, Rettig says that he "just wants his TV" and that

"this can all be solved without any sort of episode or use of force or violence."  (*Id.* at

01:33-01:47.)

The other inmates housed in Aspen B-Wing talk to Rettig throughout, though

their statements are not always audible.  At one point, in response to a statement by

a neighbor, Rettig refers to the January 26, 2021 incident, stating: "I know cause shit

if they f—ed my jaw up and my leg up that bad over taking a step out, you know,

taking a step forward while handcuffed behind my back, you know shit, they might

f—ing kill me in here for holding a slot open."  (*Id.* at 02:06-02:20.)

Rettig spends the next several minutes quietly singing and whistling before he

is approached by a Lieutenant.  (*Id.* at 02:21-06:26.)  The Lieutenant states: "Rettig.

One last chance."  (*Id.* at 06:27-06:30.)  Rettig responds: "I want my TV and my JP5

and I've, I've asked to speak to a police officer because I believe that that excessive

force, you know, is considered assault."  (*Id.* at 06:33-06:43.)  The Lieutenant asks

Rettig whether he is saying no, and Rettig states: "I'm, I'm saying I don't.  I don't

know if you're telling the truth or not.  (*Id.* at 06:45-06:49.)

The ensuing conversation is difficult to follow.  Though Rettig spent the first

several minutes of the video complaining about his TV, the Lieutenant references a

discussion that he and Rettig had concerning medical care, which the Lieutenant says

that Rettig received almost immediately. (*Id.* at 06:50-07:24.)  Rettig complains that he asked to see a doctor, and the Lieutenant responds that who Rettig sees is not his call to make.  The Lieutenant states that he is giving Rettig a direct order to pull his arm into his cell and asks whether Rettig is refusing the order. (*Id.* at 07:42-07:47.) Rettig responds that he is not refusing the order, but he does not know whether the Lieutenant is telling the truth because another staff member told Rettig that he could have his arm out of his cell door until Monday if he wanted. (*Id.* at 07:47-08:09.)  The Lieutenant responds that he is telling Rettig right now, as the Lieutenant on the shift, that he is not allowed to have his arm out of his cell door. (*Id.* at 08:12-08:16.) The video ends there.

### 2.  Defendants' Exhibit A-5

The first recording provided by Defendants was also taken on a handheld camera.  The recording begins with Sgt. Parkkila explaining that Rettig has taken hostage of his upper cell door slot in Aspen unit by jamming it open with a towel. (Defs. Ex. A-5 at 00:00-00:17.)  Sgt. Parkkila further explains that the Warden has authorized a move team to extract Rettig from his cell and move him to an observation cell. (*Id.* at 00:18-00:20.)  The move team then identifies themselves and moves to the front of Rettig's cell. (*Id.* at 00:21-01:27.)

As the move team approaches Rettig's cell, the recording captures Rettig with his arm sticking out of his cell door slot. (*Id.* at 01:28.)  As the camera moves closer to the front of Rettig's cell, the recording captures Rettig sitting on the ground.  Sgt. Parkkila tells Rettig to listen to CO Hill's orders. (*Id.* at 01:29-01:33.)  CO Hill then

approaches Rettig's cell door with a shield, and orders him to untie the towel from his cell door slot and throw it out of the cell. (*Id.* at 01:34-01:38.)  When Rettig refuses, CO Hill reiterates that he is giving Rettig an order: untie the towel from the cell door slot and throw it out.  (*Id.* at 01:38-01:43.)  Rettig replies "And I am telling you to f— off."  (*Id.* at 01:43-01:45.)  CO Hill then turns to the handheld camera and says: "Alright, at this time he is not complying with orders given."  (*Id.* at 01:45-01:49.)

At this point, the move team can be seen turning and stepping away from Rettig's cell.  (*Id.* at 01:50-01:53.)  Someone — it is not clear who — states: "Stay there, boys.  Party time."  (*Id.* at 01:54-01:56.)  A moment later, the same individual states: "Go get him. Strap them gas masks on tight, boys." (*Id.* at 01:59-02:05.)  Rettig then states: "Strap them on, boys.  Time to make that paycheck."  (*Id.* at 02:27-02:36.)  A moment later, Rettig says: "This could have all been solved if you would have just went and got my f—ing TV.  Too bad.  Too bad for all of us."  (*Id.* at 02:47-02:55.)  Rettig continues to hold his arm out of his cell door slot.

Before the move team reapproaches Rettig's cell door, Rettig addresses the CO holding the camera.  He tells the CO that he "might want to back away" for an inaudible reason.  (*Id.* at 03:44-03:48 .)  The CO backs up slightly and tells other staff to be careful when walking by Rettig's cell.  (*Id.* at 03:49-04:02.)

Sgt. Parkkila and CO Hill then approach Rettig's cell door slot again.  This time, Parkkila holds a chemical agent in his hands while CO Hill again holds a shield. (*Id.* at 05:12.)  Sgt. Parkkila deploys the chemical agent into the cell door slot before the officers back away.  (*Id.* at 05:13-05:17.)  Rettig continues to hold his cell door slot

open despite the deployment of the chemical agent, though he begins to cough.  (*Id.* at 05:17-05:56.)  A moment later, Rettig moves his arm long enough to throw a cup full of a clear liquid out of the cell door slot.  (*Id.* at 05:57-05:59.)  CO Hill responds by once again covering the slot with the shield.  (*Id.* at 06:00-06:11.)  Sgt. Parkkila approaches Rettig and tells him multiple times to stand up, remove his clothing, and come to the slot in order to be restrained.  (*Id.* at 06:12-06:35.)

When Rettig again refuses to follow the move team's orders, Sgt. Parkkila administers a second burst of chemical agent.  (*Id.* at 06:57-06:59.)  Once again, Rettig removes his arm in order to throw a cup of liquid out of his cell slot.  (*Id.* at 07:15-07:16.)  But this time, Rettig does not put his arm back in his cell slot.  Instead, he stands up and leans against his cell door while coughing.  (*Id.* at 07:16-07:21.)  Officer Hill repeatedly orders Rettig to get off of his door and remove his clothing  (*Id.* at 07:22-07:47.)  After a minute, Sgt. Parkkila gives Rettig the same order.  (*Id.* at 08:20-08:23.)  Rettig refuses, stating:  "F— off and get me my TV, bitches.  You all must think I'm some sort of bitch or something.  Come on, we can solve this.  Go get my TV. . . ."  (*Id.* at 08:40-09:25.)

After another minute, Sgt. Parkkila asks Rettig whether he is ready to follow orders.  (*Id.* at 10:09-10:12.)  Rettig responds that he just wants his TV, and that he "wanted to do this peacefully."  (*Id.* at 10:18-10:55.)  Rettig apologizes to the other inmates for involving them.  (*Id.* at 11:40-11:44.)  He then begins to sing.  (*Id.* at 12:27-15:58.)  While Rettig is singing, CO Hill removes the shield from in front of his cell door slot.  Once he is finished singing, Rettig turns and faces his cell window, and

asks who is going to get his TV.  (*Id.* at 16:27-16:30.)  He then admits to the CO holding the camera that the chemical agent does not feel good, and that he "threw up a little bit." (*Id.* at 16:49-17:02.) Rettig says that he is sorry if the move team is sorry, and that they can all make up if someone goes and gets his TV. (*Id.* at 17:09-17:13.)

Sgt. Parkkila and CO Hill again approach Rettig's cell door.  Rettig asks them whether they are sorry, and then resumes leaning against his cell door.  (*Id.* at 17:19.) This time, the move team unlocks and opens Rettig's cell door, as Rettig continues to lean his weight against the door and later the shield held by CO Hill.  (*Id.* at 17:29-19:30.)  The members of the move team struggle against Rettig as he repeatedly shouts and laughs at them.

Eventually, the move team is able to force Rettig into his cell.  (*Id.* at 19:30-19:32.)  Five of the move team members enter the cell, in addition to the CO holding the camera.  (*Id.* at 19:30-19:40.)  The team members work together to pin Rettig to his bed.  At this point, the camera's view of Rettig is largely obscured.  One of the team members repeatedly instructs Rettig to release his arm.  (*Id.*, at 19:40-20:23.) Though Rettig is not visible at this point, it sounds as though the officers are able to place him in some form of restraints.  (*Id.* at 20:30.)  But Rettig continues to lay on one of his arms, such that it cannot be restrained.  (*Id.* at 20:54-22:55.)  After move team members continue to order Rettig to release his arm, Rettig responds: "What's that? You said you want to go get my TV?"  (*Id.* at 20:10-20:20.)  He then shouts: "Release your rage!" (*Id.* at 21:37-21:49.)

It takes several minutes of struggle before Rettig finally releases his arm so that the move team can properly restrain him.  (*Id.* at 24:35-24:39.)  While the move team works on restraining him, Rettig repeatedly yells that he is being choked and "can't breathe" or "is dying."  (*Id.* at 23:50-24:15.)  Rettig then states: "Choking's a no-no."  (*Id.* at 24:43-24:44.)

Once the move team has control over Rettig, several members of the team back away from Rettig and exit the cell.  (*Id.* at 24:55-25:00.)  The move team spends the rest of the video removing Rettig's clothing.  (*Id.* at 25:30-)  In the meantime, Rettig states: "You guys have fun?  Me too.  I had a lot of fun.  Hopefully we can do it again sometime."  (*Id.* at 25:33-25:44.)  He then suggests that they bring a few stronger officers next time.  (*Id.* at 26:02-27:19.)

### 3.  Defendants' Exhibit A-6

The second recording provided by Defendants is from a camera facing the unit lobby.  The video begins shortly before the move team is deployed and shows a CO sitting across from Rettig's cell with a handheld camera pointed at Rettig.  (Def. Ex. A-6 at 00:00-05:20.)  Eventually, the CO switches with another CO, and walks down to the unit lobby.  (*Id.* at 05:25-05:55.)  Minutes later, the move team approaches Rettig's cell from the direction of the lobby, with the CO who was holding the original camera holding a new camera.  (*Id.* at 10:20-10:53.)  The next twenty-eight minutes depict the same events as the first recording.  (*Id.* at 10:53-38:43.)  However, this recording shows Rettig being escorted from his cell to an observation cell across the hall.  (*Id.* at 38:48-40:29.)  At one point, the move team stops in the middle of the hall

in order to remove a piece of clothing from around Rettig's leg restraints, though they are unsuccessful. (*Id.* at 39:16-40:24.) Once the team arrives at Rettig's observation cell, all but one of the move team members follow Rettig into the cell. (*Id.* at 40:39-41:00.) A few minutes later, the move team exits the observation cell and closes the cell door. (*Id.* at 42:45-42:58.)

### 4. Defendants' Exhibit A-7

The third recording provided by Defendants was filmed on a camera positioned on the opposite side of Rettig's housing wing from the camera that filmed the second recording. That camera is positioned closer to Rettig's cell. The observation cell is beyond the view of the camera, so the third recording does not show Rettig being placed in the observation cell. But with that exception, the third recording depicts the same events as the second recording. (Defs.' Ex. A-7 at 00:00-46:01.)

### 5. Defendants' Exhibit A-8

The fourth recording provided by Defendants was filmed from a camera inside the observation cell where Rettig was taken after the cell extraction. The recording shows Rettig enter the cell with the move team. (Defs. Ex. A-8 at 00:00-00:07.) The move team escorts Rettig directly to the bed in the observation cell, where they remove his arm and leg restraints.[5] (*Id.* at 00:07-02:03.) The move team then vacates the observation cell. (*Id.* at 02:03-02:09.)

---

[5]  It is worth noting that a significant portion of the fifth recording is redacted, because Rettig is unclothed by the time he reaches the observation cell. Nevertheless, the viewer can infer from the non-redacted portions of the recording that from the time Rettig is placed on the bed, the move team is working to remove his leg restraints followed by his arm restraints.

After Rettig is left alone in the observation cell, he gets up off of the bed.  (*Id.* at 02:15.)  He then walks over to the sink.  (*Id.* at 02:16-02:19.)  Rettig spends the remainder of the video washing the chemical agent from his body and face.  (*Id.* at 02:20-5:22.)

### 6.  Defendants' Exhibit A-9

The fifth and final recording provided by Defendants was filmed on four different cameras inside the Aspen housing unit lobby.  A few minutes into the video, the move team passes through the lobby.  (Defs. Ex. A-9 at 02:52-03:49.)  Approximately five minutes after that, the move team enters the lobby again, this time heading up the stairs to Rettig's wing in the Aspen housing unit.  (*Id.* at 10:20-10:42.)  And thirty-two minutes after the move team ascends the stairs to Rettig's wing, they walk back down the stairs into the Aspen lobby.  (*Id.* at 43:02-43:20.)  Rettig is not visible at any point in this recording.

### d.  Medical Records

Rettig's medical records reflect that after he calmed down following the January 26, 2021, incident, he reported feeling additional pain in his right jaw and knee. (ECF No. 31-8, PageID.232.)  The nurse noted that Rettig's jaw and knee were slightly swollen and recommended that he alternate taking Tylenol and ibuprofen.  The nurse told Rettig to send health care another note if his condition did not improve within four or five days.  (*Id.*, PageID.234.)

After Rettig continued to complain about his jaw, Rettig was given an x-ray on January 29, 2021.  (*Id.*, PageID.235.)  That x-ray showed that Rettig had

temporomandibular joint (TMJ) dysfunction that appeared to be symmetrical on both sides, but that Rettig did not have any fractures. (*Id.*)

Rettig was seen by health care again on January 30, 2021. (*Id.*, PageID.236.) During that visit, Rettig reported that he had hit his nose on his door, and that his nose had started to bleed. He further reported that he had "ongoing severe pain to right jaw and right knee." (*Id.*) The nurse noted that there was some swelling to the right knee and a small contusion. But Rettig was able to walk down a flight of stairs to get to the clinic without difficulty, and the nurse reported that his gait appeared to be normal. (*Id.*)

Later that same day, after the move team was deployed to remove Rettig from his cell, the nurse visited Rettig cell-side. (*Id.*, PageID.239.) Then nurse noted that Rettig made no complaints of pain or other health concerns, and that he had "no limp or objective expression of pain." (*Id.*, PageID.241.) During the visit, the nurse asked Rettig whether he would cooperate and attend a mental health tele-med appointment. Rettig responded that he would, and that he was "done fighting." (*Id.*)

On February 2, 2021, Rettig was given another x-ray, this time for his knee. (*Id.*, PageID.242.) The x-ray showed no fracture or dislocation, no significant degenerative changes, and no soft tissue abnormality or sizeable joint effusion. (*Id.*)

Rettig was admitted to the Munising Memorial Hospital's Emergency Department on February 22, 2021. (*Id.*, PageID.243.) Rettig reported that his knee had given out as he stood up to turn the light off in his cell. Rettig fell and hit his head, rendering him unconscious. (*Id.*)

While he was at the hospital, Rettig was given a CT scan.  (*Id.*, PageID.247.)
That CT scan produced normal results, aside from "minimal right frontal soft tissue
swelling."  There was no evidence that Rettig had any fractures as a result of his fall.
(*Id.*)

On February 23, 2021, Rettig was seen by a nurse at the facility.  (*Id.*,
PageID.248.)  The nurse noted that when staff had found Rettig the day before, he
was unconscious on his floor with blood in his nose and on his face.  Rettig told the
nurse that his head and his right knee hurt, but that he was not experiencing any
visual changes or confusion.  (*Id.*)

Rettig was given additional x-rays of his right knee and his jaw on March 10,
2021.  (*Id.*, PageID.249-250.)  The x-rays of Rettig's knee came back normal.  (*Id.*,
PageID.249.)  The x-rays of Rettig's jaw showed that when Rettig opened his mouth,
the right side of his jaw dislocated by eight or nine millimeters.  (*Id.*, PageID.250;
ECF No. 33-4, PageID.335.)

On October 27, 2021, Rettig was evaluated at the TMD and Orofacial Pain
Clinic at the University of Michigan Oral and Maxillofacial Surgery/Hospital
Dentistry Department.  (ECF No. 33-5, PageID.337.)  Rettig reported that he had
been waking up with pain under his right ear and in the right side of his jaw.  He also
reported experiencing a "locking episode" which lasted for five minutes.  (*Id.*)

On December 15, 2021, Rettig was fitted for a mandibular intraoral orthopedic
appliance.  (ECF No. 33-6, PageID.339.)  Rettig received the appliance on January

31, 2022.  (ECF No. 33-7, PageID.341.)  On December 2, 2022, Rettig underwent jaw surgery.  (ECF No. 33-8, PageID.343.)

## III.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.    Excessive Force

The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime.  Punishment may not be "barbarous", nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958).  The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S.

at 346.  Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification."  *Id.*

To establish an Eighth Amendment claim, a plaintiff must satisfy both an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).  "The objective component requires the pain inflicted to be 'sufficiently serious.'"  *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Wilson*, 501 U.S. at 298).  "The subjective component focuses on the state of mind of the prison officials."  *Williams v. Curtin*, 631 F.3d at 383.

While all Eighth Amendment claims involve an objective and a subjective component, the objective component is contextual and therefore varies depending on the claim asserted.  *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).  The degree of harm necessary to satisfy the objective component depends on "contemporary standards of decency."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

The essential inquiry for an Eighth Amendment claim of excessive force is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).  In making this inquiry, courts are guided by "factors [such] as the need for application of force, the relationship between the need and the amount of force that was used [and] the extent of injury inflicted." *Id.* at 320-21.

Rettig leans heavily into the extent of his injuries in arguing that there is a genuine issue as to whether Defendants utilized excessive force against him.  (See ECF No. 33, PageID.300-302.)  To reiterate, Rettig avers that he had serious jaw and

knee injuries as a result of the January 26, 2021, incident, and that he had spleen, kidney, and lung injuries as a result of the January 30, 2021, incident, which caused him to urinate blood.  (ECF No. 1, PageID.6; ECF No. 33-2, PageID.315-317, 324 (Rettig Dep.).)  Rettig contends that Defendants' actions were disproportionate.  (*Id.*, PageID.300-302.)  With respect to the January 26, 2021, incident, Rettig goes so far as to assert that a reasonable jury could find that the force utilized by COs Neun and Tennyson was "entirely unnecessary."  (*Id.*, PageID.301.)

As an initial matter, the undersigned notes that the medical evidence on the record appears to support Rettig's claim that he sustained a jaw injury as a result of the January 26, 2021, incident.  Indeed, Rettig eventually underwent surgery to correct his jaw.  (ECF No. 33-8, PageID.343.)  And Rettig did report experiencing pain in his knee following the incident, though x-rays of his knee came back normal.[6]  (*Id.*, PageID.236, 242).  However, there is no medical evidence on the record to support Rettig's alleged spleen, kidney, or lung injuries.  But even accepting that Rettig sustained the alleged injuries, the undersigned emphasizes that "[w]hile the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Cordell v. McKinney*, 759 F.3d 573, 580-81 (6th Cir. 2014) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)).  "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38.  In the undersigned's

---

[6]    It is worth noting that despite any injury to his jaw or knee on January 26, 2021, Rettig spent a good part of the January 31, 2021, incident singing, and encouraging Defendants to use force against him.

opinion, the video evidence establishes that Defendants did not utilize excessive force despite Rettig's alleged injuries.

Rettig suggests that during the January 26, 2021, incident he was "neutralized" by the tether attached to his handcuffs.  (ECF No. 33, PageID.301.)  He characterizes his conduct as simply moving forwards or attempting to enter his cell, rather than forcibly pulling on his tether in an attempt to escape CO Neun's hold. (*Id.*, PageID.296, 300.)  And he complains that the COs slammed or threw him to the floor.  (*Id.*)  But the video recordings of the January 26, 2021, incident clearly show that Rettig was pulling on his restraints in the direction of CO Britton.  (*See, e.g.*, Defs.' Ex. A-1 at 02:06-02:12.)  CO Tennyson only took Rettig to the ground after both CO Neun and CO Tennyson had taken hold of Rettig's handcuff tether, and Rettig had continued to pull against the officers.  *Id.*  And Rettig's contention that "the video shows that [he was] not kicking or trying to get away once restrained on the floor" is misleading at best.  The recordings show Rettig kicking his feet even after he was taken to the ground.  (*See, e.g.*, Defs.' Ex. A-1 at 02:12-02:22.)

In the undersigned's opinion, there are no genuine issues of material fact as to whether the January 26, 2021, incident involved the use of excessive force.  The video evidence establishes that COs Tennyson and Neun utilized force in response to Rettig's physical resistance, and in order to restore control over Rettig.  It is unfortunate that Rettig sustained an injury as a result of that force, but no reasonable jury could determine that the use of force was excessive under the circumstances presented.

As for the January 30, 2021, incident, Rettig characterizes Defendants' conduct as breaching his cell and then unnecessarily "piling on top of him" even though he was "choking and on the floor" as a result of being hit with multiple rounds of chemical agents.   (ECF No. 33, PageID.302.)   Rettig further alleges that the Defendants unnecessarily punched and choked him.  (*Id.*)

Rettig fails to acknowledge that after the first round of chemical agents, he continued refusing to remove his arm from his cell door slot.  (*See, e.g.*, Defs.' Ex. A-5 at 05:17-05:56.)  After both rounds of chemical agents, he threw unknown liquids at Defendants.  (*Id.* at 05:57-05:59, 07:15-07:46.)   After that, Rettig refused to undress and allow himself to be restrained, such that Defendants had to forcibly extract him from his cell  (*Id.* at 07:22-17:19.)

Furthermore, when Defendants finally opened Rettig's cell door, he was not sitting on the floor choking.  To be sure, Rettig was coughing from the chemical agent, but he was leaning all of his weight against Defendants trying to prevent them from entering his cell.  (*Id.* at 17:29-19:30.)  And once Defendants entered Rettig's cell despite his efforts to exclude them, they hardly "piled on top" of Rettig.  Instead, Defendants worked together to restrain Rettig and remove his clothing.  (*Id.* at 19:30-24:39.)  Some Defendants were leaning on Rettig, but others were standing or even crouching on the floor.  And even then, Rettig laid on one of his arms in an attempt to prevent Defendants from restraining him.  Just as Rettig had ignored numerous orders to remove his arm from his cell door slot, Rettig ignored numerous orders to

release his arm, forcing Defendants to physically struggle with him in order to properly restrain him.

All in all, Defendants spent twenty-five minutes attempting to diffuse the situation while Rettig refused their orders and physically resisted their attempts to restrain him. Although Rettig alleged that he was choked by Defendants in both his pleadings and during the incident, Rettig spends the entirety of the video talking and mocking Defendants. Indeed, Rettig laughed at Defendants after he was restrained, and told them to send stronger officers next time around. (*Id.* at 26:02-27:19.)

Furthermore, it is the undersigned's opinion that Rettig's allegations that Defendants unnecessarily choked Rettig and punched him with handcuffs are foreclosed by the findings of the Hearing Officer involved in Rettig's misconduct hearing for the four Class I assault and battery misconducts Rettig received following the January 30, 2021, incident. The Sixth Circuit test for determining whether factual findings made within a Class I misconduct hearing are entitled to preclusive effect was established in *Peterson v. Johnson*, 714 F.3d 905, 912 (6th Cir. 2013) (citing *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)).

Facts found during a Michigan prison hearing are given preclusive effect when:

(1) the state agency "act[ed] in a 'judicial capacity'"; (2) the hearing officer "resolved a disputed issue of fact that was properly before it"; (3) the prisoner "had an adequate opportunity to litigate the factual dispute"; and, (4) if these other three requirements are met, we must "give the agency's finding of fact the same preclusive effect it would be given in state courts."

*Maben v. Thelen*, 887 F.3d 252, 259 (6th Cir. 2018) (alteration in original) (quoting *Peterson*, 714 F.3d at 911-13). The Sixth Circuit in *Peterson* determined that a major

misconduct hearing (i.e., a Class I Misconduct Hearing) satisfies the first and last criteria as long as the other two criteria are satisfied. *Peterson*, 714 F.3d at 912-14.

The Class I Misconduct Hearing Report and Continuation for the four Class I assault and battery misconducts is shown below:

MICHIGAN DEPARTMENT OF CORRECTIONS
CSJ-240B Rev. 10/10

**CLASS I MISCONDUCT HEARING REPORT**

| Prisoner | Prisoner Name | | Facility Code | Lock | Violation Date |
|---|---|---|---|---|---|
| 307829 | Rettig | | LMF | A-215 | 01/30/2021 |

Charge(s)
**Assault and Battery, Assault and Battery, Assault and Battery, Assault and Battery**

| If Charge Changed by Hearing Officer | Plea | |
|---|---|---|
| **Page 1 of 2** | ☐ Guilty | ☒ Not Guilty |

| Misconduct Report Read to and Discussed with Prisoner | ☒ (check if applies) | No Hearing Investigation Requested |
|---|---|---|
| Hearing Investigation Read to and Discussed with Prisoner | ☒ (check if applies) | ☐ (check if applies) |

**EVIDENCE/STATEMENTS IN ADDITION TO MISCONDUCT REPORT**

Prisoner is present for the hearing and the four misconduct reports dated 1 30-2021 are combined for hearing and are reviewed with statements from prisoner Rettig 4 pages, a statement regarding the video 4 pages, pictures from the video 4 pages, screening from 1 page and a statement regarding the video 1 page and two pictures from the video. This ALJ did view the video. Prisoner is informed that this ALJ did view the video. Prisoner asks if the hearing is being recorded and is told these hearings are not recorded. Prisoner states he is not guilty and the officer was using the cuffs as knuckleduster and was hitting me. I went to the bed and my arms were tucked in and I could not move my legs and the clear shield was on top of me. Officers were on my right and left trying to pry my hands apart. The officer on my right was hitting me with handcuffs and I saw them. The officer on my left put me in a choke hold and could not breath and was yelling I gave up and was in fear of my life and its on video and they tried to harm me on purpose and I want to file charges and declines further statement. No further evidence is requested or is necessary. Prisoner is informed of the sanction and the decision and told that a copy of the hearing report would be delivered to him.

(SEE PAGE TWO)

**REASONS FOR FINDINGS**

The video, pictures and the statement regarding the video do support the charge and does show prisoner Rettig resisting the officers entering his cell striking prisoner and is marked confidential for security purposes Pursuant to PD 03.03.105 Assault and Battery: Intentional, non-consensual touching of another person done either in anger or with the purpose of abusing or injuring another....A physical interference and a physical resistance... On 1-30-2021 at 1904 hrs the Officers Hill, Trombley, Moote and Lester attempted to gain entrance to prisoner Rettig's cell so restraints could be applied. Once the door was open prisoner Rettig began to push back on the shield resisting the officers entry into the cell. Officer Hill then forcefully gained entry to the cell and placed prisoner Rettig on the bed with the shield so restraints could be applied. Prisoner Rettig resisted officer Trembley once in the cell by kicking and moving his body away from officer Trembley. Prisoner Rettig push back on officer Moote and refused to put his hands behind his back and grabbed onto the restraints that officer Moote had. Prisoner Rettig kicked officer Lester in the knee with his foot and did not stop resisting even after orders to stop resisting were given. I find that this was a intentional non-consensual touching by prisoner Rettig to Officers Hill, Trombley, Moote and Lester in order to injure and abuse them by not allowing the responding officers resisting

**PROPERTY DISPOSITION (for contraband see PD 04.07.112)**

**FINDINGS**

| | | | | | | |
|---|---|---|---|---|---|---|
| Charge No. 1 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 008 | |
| Charge No. 2 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 008 | |
| Charge No. 3 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 008 | |
| Charge No. 4 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 008 | |

**DISPOSITION (select one or more) (Toplock & LOP Sanctions End at 6:00 am)**

| | | Begins | Ends | | | |
|---|---|---|---|---|---|---|
| 20 | Days of Detention | 02/08/2021 | 02/28/2021 | | Days Credit | |
| | Days Top Lock | | | $ | Hours Extra Duty | |
| 60 | Days Loss of Privileges | 03/25/2021 | 05/24/2021 | | REHEARING INVESTIGATOR | |

| Misconduct Hearing Report personally handed to Prisoner by Hearing Officer on this date: _____ (Check if Applies) ☐ | Hearing Report given to Staff Member by Hearing Officer for Delivery to Prisoner this date: **2/3/2021** (Check if Applies) ☒ |
|---|---|
| Date of Hearing **02/03/2021** | Name of Staff Member **Jack** |

| Hearing Officer's Name | Hearing Officer's Signature | Date |
|---|---|---|
| Theut 048 | | 2-3-2021 |

MICHIGAN DEPARTMENT OF CORRECTIONS

CSJ-240D  12/90
4835-4243

**Major Misconduct**                    HEARING REPORT – Continuation Page No.    2
                    (Type of Hearing)

| Prisoner Number | Prisoner Name | Institution | Violation/Notice Date |
|---|---|---|---|
| 307829 | Rettig | LMF | 1-30-2021 |

Findings:  in his cell and resisting  by pushing back on the shield, kicking and moving away from the reporting officers pushing back on the officer Moote and grabbing the restraints and kicking officer Lester in the knee.  Prisoner Rettig is not believed in his statement that he was struck with restraints by an officer using it as he states a "knucklebuster" or was choked by an officer  and at no time is this shown on the video.  Prisoner Rettig is not believed in his statement that he is not guilty because he was given several orders to stop resisting and from the time the reporting officers entered the cell prisoner Rettig resisted by pushing his body back against officer Hill and the shield and other  officers and prevented them from entering the cell even though the door was open part way  and once insde the cell prisoner Rettig continued to resist by pulling his body away from the officers  Hill and Trombley and not allowing them to place restraints on his hands which officer Moote tried to do  and kicked officer Lester in the knee  with his foot and grabbed onto  the restraints  that were held by officer Moote.    I find no credible evidence that the reporting officers have lied or fabricated their statements.  Officers Hill, Moote, Lester and Trombley are clear and consistent  in their statements and found credible.  The charges are upheld.

(ECF No. 31-6, PageID.192.)

In the undersigned's opinion, the disputed issues of fact — whether Defendants choked Rettig or punched him with handcuffs — were properly before the Hearing Officer, as Rettig offered those facts as a part of his defense to the charges. Furthermore, Rettig had a sufficient opportunity to litigate the dispute during the misconduct hearing.  Accordingly, it is the undersigned's opinion that the Hearing Officer's determinations that Defendants did not choke Rettig or strike him with handcuffs are entitled to preclusive effect.

Rettig is correct that the Hearing Officer's findings do not preclude him from asserting that he was subjected to excessive force.  (*See* ECF No. 33, PageID.301-302.) Even had the Hearing Officer determined that Rettig was not subjected to excessive force, legal conclusions are not entitled to preclusive effect.  *See White v. McKay*, No. 22-1926, 2023 WL 8060847, at *2 (6th Cir. Nov. 17, 2023).  But again, for the reasons set forth above, the Hearing Officer's *factual findings* that Defendants did not punch or choke Rettig during the incident are entitled to preclusive effect.

Ultimately, even if the Hearing Officer's findings were not entitled to preclusive effect, the undersigned's opinion would remain the same: there are no genuine issues of material fact as to whether the January 30, 2021, incident involved the use of excessive force. The video recordings of the incident establish that Defendants utilized force in response to Rettig's physical resistance, and in order to restore control over Rettig. Once again, it is the undersigned's opinion that no reasonable jury viewing the video recordings of this incident could determine that the use of force was excessive.

## V.     Failure to Intervene

An officer is liable for another officer's use of excessive force where the defendant "'observed or had reason to know that excessive force would be or was being used' *and* 'had both the opportunity and the means to prevent the harm from occurring.'" *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (emphasis in original) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)); *accord Alexander v. Carter ex rel. Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018).

Rettig alleges that when he returned to his cell with COs Tennyson and Neun on January 26, 2021, CO Britton was waiting in the cell. (ECF No. 1, PageID.6.) In its screening opinion, the Court determined that this allegation "permitted an inference that Defendant Britton observed the use of excessive force by Defendants Tennyson and Neun because he was in the room when and where it occurred." (ECF No. 5, PageID.30.) Because it is the undersigned's opinion that there are no genuine issues of material fact, and that the video recordings establish that COs Tennyson

and Neun did not utilize excessive force against Rettig on January 26, 2021, it is necessarily the undersigned's opinion that there are no genuine issues of material fact, and that CO Britton did not fail to intervene in the use of excessive force against Rettig.

## VI.    Qualified Immunity

In addition to arguing that they did not violate Rettig's rights under the Eighth Amendment, Defendants assert that they are entitled to qualified immunity in their individual capacities.  (ECF No. 31, PageID.130-131.)

Defendants' claim of qualified immunity is largely redundant.  After initially arguing that they are entitled to judgment because they did not violate Rettig's Eighth Amendment rights, they argue that they are entitled to qualified immunity because they did not violate Rettig's Eighth Amendment rights.[7]   In any event, the undersigned agrees; because there are no genuine issues of material fact and it is the undersigned's opinion that Defendants did not violate Rettig's Eighth Amendment rights, it is the undersigned's opinion that Defendants are entitled to qualified immunity in their individual capacities.  *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[7]    In other words, Defendants do not argue that the rights at issue were not clearly established in January of 2021.

constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

## VII.   State Law Claims

As mentioned above, Rettig asserts state law claims in addition to his federal claims.  In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *Id.* Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss all of Rettig's federal claims.  The balance of the relevant considerations would therefore weigh against the exercise of supplemental jurisdiction.  As such, the undersigned respectfully recommends that the Court decline to exercise supplemental jurisdiction.

## VIII.  Recommendation

In the undersigned's opinion, there are no genuine issues of material fact with respect to Rettig's federal claims.  Even viewing the facts in the light most favorable to Rettig, a reasonable juror could not determine that Defendants utilized excessive

force or failed to intervene in the use of excessive force against Rettig on January 26, 2021, or January 30, 2021.  Videos of the incidents establish that Rettig continually refused to adhere to staff orders.  Furthermore, the videos establish that Rettig physically resisted staff.  It is clear from the videos that staff utilized force against Rettig on both dates in order to regain control over Rettig, and not maliciously or sadistically to cause harm.  Accordingly, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment as to Rettig's federal claims.

Because the undersigned recommends granting Defendants summary judgment on their federal claims, the undersigned further recommends that the Court decline to exercise supplemental jurisdiction over Rettig's state law claims.

If the Court accepts this recommendation, this case will be dismissed.


Dated:  April 4, 2024                                    /s/ *Maarten Vermaat*
                                                         MAARTEN VERMAAT
                                                         U. S. MAGISTRATE JUDGE


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).